UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ASAK MIA

          Plaintiff,

   -against-

TRACY RENAUD,
ALEJANDRO MAYORKAS,
TEXAS SERVICE CENTER, and
MERRICK GARLAND,

        Defendants.

**MEMORANDUM AND ORDER**

Case No. 22-CV-2098 (FB)

*Appearances:*
*For the Plaintiff*:
KHAGENDRA GHARTI-CHHETRY
Chhetry & Associates, P.C.
363 7th Avenue, 15th Floor
New York, NY 10001

*For the Defendants*:
BREON PEACE
United States Attorney
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

     Plaintiff Asak Mia ("Mia"), a national of Bangladesh to whom the United

States granted asylum in 2012, seeks review under the Administrative Procedure

Act ("APA") of a United States of Citizenship and Immigration Services

("USCIS") decision denying his application to adjust his status to that of lawful

1

permanent resident.  Defendants the Acting Director of the USCIS Tracy Renaud, U.S. Attorney General ("AG") Merrick Garland, Secretary of the U.S. Department of Homeland Security ("DHS") Alejandro Mayorkas, and the USCIS Texas Service Center (collectively, "the Defendants") have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment, pursuant to Rule 56.  For the reasons stated below, Defendants' motion to dismiss is GRANTED.

## I.    BACKGROUND

The following background facts are drawn from the Complaint and its attached exhibits.  Unless noted, these facts are undisputed, and the Court assumes their truth in assessing Defendants' motion to dismiss.  *See Melendez v. City of New York*, 16 F.4th 992, 996 (2d Cir. 2021).  Because the Court sits as a reviewing court in an APA case, the Court also considers the Certified Administrative Record ("CAR").  *See Espindola v. United States Dep't of Homeland Sec.*, No. 120CV1596MADDJS, 2021 WL 3569840, at *5 (N.D.N.Y. Aug. 12, 2021) (citing cases) ("A district court, therefore, properly considers the administrative record at the motion to dismiss stage.").

Mia is a national of Bangladesh who currently resides in the Eastern District of New York.  Since 1997, Mia has been a member of one of the primary political parties in Bangladesh, the Bangladesh Nationalist Party ("BNP"), or one of its

affiliated groups.  Mia stated that he became a "popular BNP leader in [his] area" in Bangladesh, "tried [his] level best in all party processions, meetings, house to house soliciting and distributing the publications of election," and remains a member of the BNP to the present day.

On November 30, 2010, Mia entered the United States without inspection and was subsequently apprehended by U.S. Border Patrol.  Mia filed a Form I-589, an Application for Asylum and for Withholding of Removal, which an Immigration Judge ("IJ") granted in 2012 because Mia was targeted by the Bangladesh Awami League Party for his political opinions.  In 2013, Mia filed a Form I-485, Application to Register Permanent Residence or Adjust Status — *i.e.*, to obtain a "green card" — pursuant to the Immigration and Nationality Act (INA), 8 U.S.C. § 1159(b), which enables a foreign national who has been granted asylum and has been physically present in the United States for one year to apply for adjustment of status to lawful permanent resident.

The § 1159(b) determination proceeds under a two-step inquiry: (1) whether the foreign national is eligible for adjustment of status; and (2) if the foreign national is eligible, whether the foreign national warrants a favorable exercise of discretion.  *See Morina v. Mayorkas*, No. 22-CV-02994 (LJL), 2023 WL 22617, at *2 (S.D.N.Y. Jan. 3, 2023) (describing statutory framework).  Under this first step, Section 212(a)(3)(B) of the INA, as amended by the REAL ID Act of 2005, *see* 8

U.S.C. § 1182, supplies statutory grounds for ineligibility, including, as is relevant

here, that "[a]ny alien who – (I) has engaged in a terrorist activity . . . is

inadmissible." *Id.* § 1182(a)(3)(B).  "Engaging in terrorist activity" includes

"solicit[ing] any individual . . . for membership in a terrorist organization," *id.* at §

1182(a)(3)(B)(iv)(V)(cc), and "afford[ing] material support . . . to a terrorist

organization."  *Id.* at § 1182(a)(3)(B)(iv)(VI)(dd).  "Terrorist organization"

includes three tiers of organizations, including, at issue here, Tier III, or

undesignated terrorist organizations that meet the statutory definition of "a group

of two or more individuals, whether organized or not, which engages in, or has a

subgroup which engages in" terrorist activity, a determination made by

adjudicators on a case-by-case basis.[1]  *See* 8 U.S.C. § 1182(a)(3)(B)(iv)(III).

Applying this framework, USCIS issued a Notice of Intent to Deny

("NOID") in 2021, notifying Mia that it intended to deny his Form I-485 and

detailing its anticipated grounds for denial.  *See* CAR 44-60.  After concluding that

the BNP and its affiliated groups fell within the definition of a Tier III terrorist

organization during Mia's period of involvement because of its well-documented

---

[1] The Secretary of State and the Secretary of Homeland Security, after consultation
with the Attorney General, may make certain exemptions from the terrorism-
related inadmissibility grounds, although the decision to grant a terrorism
exception is in the Secretary of State's and Secretary of Homeland Security's "sole
unreviewable discretion."  *See* 8 U.S.C. § 1182(d)(3)(B)(i); *Morina*, 2023 WL
22617, at *3.

history of engaging in political violence, USCIS found (1) that Mia's "recruitment activity for the BNP falls within the definition of engaging in terrorist activity for a Tier III terrorist organization under Section 212(a)(3)(B)(iv)(V)(cc) of the INA"; and (2) "his distribution of BNP leaflets, organizing BNP meetings/processions, and campaigning on behalf of BNP candidates falls within the definition of providing material support to a Tier III terrorist organization under Section 212(a)(3)(B)(iv)(VI)(dd) of the INA." *See* CAR 55-56.

Through counsel, Mia subsequently submitted a rebuttal to the NOID, but on January 3, 2022, USCIS denied Mia's I-485 application on the same grounds as in the NOID. *Id.* at 1-19. USCIS further concluded that no exercise of discretionary authority to exempt Mia's inadmissibility was warranted, although it informed Mia that he would not lose asylum status or work authorization unless USCIS or the Executive Office for Immigration Review (EOIR) formally terminated his asylum status. *Id.* at 14-15.

Mia subsequently commenced this action, challenging the determination to deny his I-485 Application under the APA, 5 U.S.C. § 706(2)(A), which enables a reviewing court to set aside an agency action, finding, or conclusion found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Pursuant to Rules 12(b)(6) and 56, Defendants have moved to dismiss or, in the alternative, for summary judgment.

## II.   JURISDICTION

Defendants move to dismiss on the grounds that federal courts lack jurisdiction to review the USCIS determination under a jurisdiction-stripping provision, 8 U.S.C. § 1252(a)(2)(B)(ii).  If the provision at issue strips judicial review of the USCIS decision, Mia's APA claims must fail.  *See Ying Lin v. United States Dep't of Homeland Sec.*, 699 F. App'x 44, 46 (2d Cir. 2017) ("[J]udicial review of agency action is not available under the APA where such review is limited by another statute—here, the INA.").  But as the Second Circuit recently noted, whether § 1252(a)(2)(B)(ii) precludes review in these circumstances is an open question.  *See Rahman v. Mayorkas*, No. 22-904-CV, 2023 WL 2397027, at *1, n.2 (2d Cir. Mar. 8, 2023) ("declin[ing] to address this open question" of "whether we have jurisdiction to review any aspect of a USCIS decision denying discretionary relief, such as a status adjustment, outside of a removal proceeding.").  The party asserting jurisdiction bears the burden of showing that the Court has subject-matter jurisdiction.  *See Sharkey v. Quarantillo*, 541 F.3d 75, 82 (2d Cir. 2008).

Following the Supreme Court's instructions for interpreting jurisdiction-stripping statutes, the Court begins with the "strong presumption in favor of judicial review," which can be overcome only if there are "clear and convincing indications" that Congress meant to foreclose review.  *See SAS Inst., Inc. v. Iancu*,

138 S. Ct. 1348, 1359 (2018) (citing *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016)).  The "clear and convincing indications" needed to overcome this strong presumption include "specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole, that Congress intended to bar review."  *See Cuozzo*, 579 U.S. at 273 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 349–350 (1984)) (internal quotation marks omitted).  The Court has "consistently applied the presumption of reviewability to immigration statutes."  *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069–70 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)) (internal quotation marks omitted).

Turning to the statutory text, 8 U.S.C. § 1252(a)(2)(B)(ii) provides that "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."  *Id.*  Two issues are key to the Court's analysis: (1) whether this provision applies to "decisions or actions" outside the removal context, such as here, where an asylee has applied for adjustment of status under § 1159(b); and (2) whether the phrase "the authority for which is specified . . . to be in the discretion" of the AG or Secretary of Homeland Security precludes review of both discretionary and non-discretionary determinations.

First, the Court must determine whether the jurisdiction-stripping provision 8 U.S.C. § 1252(a)(2)(B)(ii) applies to adjustments of status outside the removal context. The Court joins the majority view that § 1252(a)(2)(B) applies with equal force to agency decisions made outside the removal context, such as here. Section 1252(a)(2)(B) states that courts lack jurisdiction "*regardless* of whether the judgment, decision, or action is *made in removal proceedings*," which signifies that the jurisdiction-stripping provisions were not intended to deprive courts of jurisdiction only when someone challenges an order of removal. *See* 8 U.S.C. § 1252(a)(2)(B) (emphasis added). As the D.C. Circuit recently explained, the "'regardless' clause makes clear that the jurisdictional limitations imposed by § 1252(a)(2)(B) also apply to review of agency decisions made outside of the removal context." *See Abuzeid v. Mayorkas*, 62 F.4th 578, 584 (D.C. Cir. 2023) (cleaned up); *see also Doe v. Sec'y, U.S. Dep't of Homeland Sec.*, No. 22-11818, 2023 WL 2564856, at *2 (11th Cir. Mar. 20, 2023) (district court correctly held that it lacked subject matter to review plaintiff's application for adjusted status made outside of the removal context under § 1255(m)); *Taleb v. Mayorkas*, No. CV 22-10409, 2023 WL 1928558, at *3 (E.D. Mich. Feb. 10, 2023) (collecting cases); *Rabinovych v. Mayorkas*, 624 F. Supp. 3d 19, 25 (D. Mass. 2022), *appeal dismissed*, No. 22-1731, 2023 WL 2770984 (1st Cir. Jan. 13, 2023) (same). And while the title's section is unhelpfully entitled, "Judicial Review of Orders of

Removal," that title "cannot be used to limit the plain meaning of the text. *Abuzeid*, 62 F.4th at 584 (quoting *Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*, 252 F.3d 473, 481 (D.C. Cir. 2001)).

Second, the Court must determine whether § 1252(a)(2)(B)(ii) precludes review of non-discretionary decisions. The operative question is whether the first-step, statutory eligibility decision — laid out as a precondition for adjustment in § 1159(b) and elaborated by § 1182 — is a "decision or action . . . the authority for which is specified to be in the discretion of the AG or Secretary of Homeland Security." 8 U.S.C. § 1252(a)(2)(B)(ii). As the Second Circuit recently stated in *Rahman*, this is an open question. *See* 2023 WL 2397027, at *1 (citing *Patel v. Garland*, 596 U.S. 328, 345-46 (2022)) (declining to address the issue and instead assuming "hypothetical jurisdiction").

There are two possible ways of reading the phrase. First, as Mia contends, because the statutory admissibility decision is not a discretionary determination made by the AG or DHS Secretary, it is not a decision or action "the authority for which is specified to be" in their discretion. Under this reading, only discretionary determinations — such as the ultimate decision to adjust status or whether to make an exemption from the terrorism-related inadmissibility grounds — are decisions or action "the authority for which is specified to be in the discretion" of the AG or Secretary of Homeland Security. By contrast, non-discretionary decisions, such as

9

statutory determinations of eligibility, are, by definition, not specified by discretionary authority — instead, USCIS must determine the issue.  This interpretation is consistent with the heading of § 1252(a)(2)(B), "Denials of discretionary relief."

A second, alternative way of reading this provision — as Defendants urge — is that the provision strips judicial review of all determinations, discretionary and non-discretionary decisions alike, so long as the agency acts under statutory authority that provides discretion to either the AG or Secretary of DHS, such as § 1159(b).  Stated differently, the phrase "authority for which is specified to be in the discretion" merely identifies the over thirty provisions in the relevant subchapter of the INA that grant the AG discretion to make a certain decision.  *See Kucana v. Holder*, 558 U.S. at 247 (noting such provisions).  Accordingly, the argument follows, because § 1159(b) states that the AG or DHS Secretary can adjust the status of people granted asylum "in [their] discretion," the jurisdictional bar applies to all determinations made under this provision, including non-discretionary, preliminary eligibility determinations.  Two Southern District of New York courts have read the phrase this way.  *See Azatullah v. Mayorkas*, No. 1:20-CV-01069-MKV, 2023 WL 5935028, at *5 (S.D.N.Y. Sept. 12, 2023); *Morina*, 2023 WL 22617, at *9.

To determine whether the statute has sufficiently "clear and convincing indications" to overcome the strong presumption in favor of reviewability,[2] the Court first begins with the text. Section 1252(a)(2)(B)(ii) is unfortunately not an exemplar of clarion draftsmanship, and the Court finds either of the two readings plausible. However, the ambiguity in the provision inveighs against a finding that would overcome the "strong" presumption in favor of reviewability. Indeed, to the extent that there is textual ambiguity, Supreme Court precedent has repeatedly pronounced that only "clear and convincing" indications can overcome this presumption, and "when a statutory provision is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069–70 (2020) (cleaned up). The split in authority among courts on this issue implies that the provision is one "reasonably susceptible to divergent

---

[2] Courts, including the Supreme Court, are inconsistent as to whether the presumption applies at the outset of the statutory analysis or whether it only applies if the statute is ambiguous. *Compare Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) ("[c]onsider first a familiar principle of statutory construction: the presumption favoring judicial review of administrative action.") (internal quotations omitted) *with Patel*, 596 U.S. at 346 ("Patel and the Government insist that the statute is ambiguous enough to trigger the presumption that Congress did not intend to foreclose judicial review."). The Court believes that a "presumption" more naturally applies at the outset of statutory interpretation, but in any event, the ambiguity in the provision at issue would trigger the presumption.

interpretations." *Compare Morina*, 2023 WL 22617, at *9 (holding that § 1252(a)(2)(B)(ii) deprives courts of jurisdiction to review non-discretionary determinations) *with Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (holding that district court has jurisdiction to review USCIS's determination that asylee Hosseini is inadmissible for adjustment of status because "admissibility determinations—even those underlying a discretionary decision—are non-discretionary determinations that are subject to judicial review.") *and U.S. ex rel. Vaso v. Chertoff*, 369 F. App'x 395, 401 (3d Cir. 2010) ("The determination that an alien is statutorily inadmissible is a nondiscretionary, legal determination, for which § 1252 does not foreclose review.").

Furthermore, this interpretation comports with the traditional "distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand" in the immigration law context.  *I.N.S. v. St. Cyr*, 533 U.S. 289, 307 (2001), *superseded by statute on other grounds as stated in Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020).  Under this distinction, "[e]ligibility that was governed by specific statutory standards provided a right to a ruling on an applicant's eligibility, even though the actual granting of relief was not a matter of right under any circumstances, but rather is in all cases a matter of grace." *Id.* (quoting *Jay v. Boyd*, 351 U.S. 345, 353–354 (1956)) (internal quotation marks omitted).  Congress's use of the word "discretion" can be read to reflect this

longstanding distinction between non-discretionary decisions made as a "matter of right," and discretionary decisions made as a "matter of grace."

Finally, the icing on the cake is the context. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) (quoting A. Scalia, A Matter of Interpretation 37 (1997)) ("In textual interpretation, context is everything.").  The decision to adjust one's status to permanent resident is a profound administrative determination, one that affects the life trajectory of hundreds of thousands of people caught in the farrago of the immigration system.  *See Patel*, 596 U.S. at 363 (Gorsuch, J., dissenting) (noting that over a three-month period alone, USCIS denied more than 13,000 green-card applications, while another 790,000 sat pending).  Congress adopted § 1252(a)(2)(B)(ii) in 1996, *see* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 306, 110 Stat. 3009, 3009-607 (codified at 8 U.S.C. § 1252(a)(2)(B)(ii)), yet a broad construction § 1252(a)(2)(B)(ii) today would suppose that, for the past twenty-five years, Congress has been silent about its intent to deprive numerous, vulnerable people of the opportunity for a federal court to review blatant administrative errors. As the familiar maxim goes, Congress does not "hide elephants in mouseholes," *i.e.*, it does not alter the fundamental details of a scheme in vague or ancillary provisions.  *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) (Scalia, J.).

*Patel v. Garland*, 596 U.S. 328 (2022), does not compel a different decision. There, a 5-4 Court held that federal courts lack jurisdiction to review facts found as part of an application for discretionary adjustment to lawful permanent resident status in a removal proceeding.  While *Patel* construed a different provision, 8 U.S.C. § 1252(a)(2)(B)(i), than the provision at issue in this case, Justice Barrett's majority opinion stated in *dicta* that it was possible that Congress "did, in fact, intend to close that door" to "all review of USCIS denials of discretionary relief." *Id.* at 345-46.  In a dissent, Justice Gorsuch objected to the possibility that the majority's construction could leave individuals seeking to adjust their status and secure a green card outside the removal context with "likely . . . no avenue for judicial relief of *any kind*," including in federal district court.  *Id.* at 363 (Gorsuch, J., dissenting) (emphasis in original).

*Patel*, however, does not foreclose judicial review in this case.  Indeed, the Second Circuit explicitly acknowledged that in the wake of *Patel*, "there is an open question as to whether we have jurisdiction" under § 1252(a)(2)(B)(ii) and asserted "hypothetical jurisdiction."  *See Rahman*, 2023 WL 2397027, at *1 (citing *Patel*, 596 U.S. at 345-46).  Moreover, *Patel* is distinguishable.

First, the provision at issue in *Patel*, § 1252(a)(2)(B)(i), materially differs from § 1252(a)(2)(B)(ii).  As *Patel* stated, the "outcome of this case largely turns on the scope of the word 'judgment,'" *Patel*, 596 U.S. at 337, and the Court

determined that "judgment" included non-discretionary determinations. Significantly, in construing "judgment" broadly, the *Patel* Court reasoned that Congress "could have easily used" the language "discretionary judgment" and underscored "the absence of *any reference to discretion* in § 1252(a)(2)(B)(i)." *Id.* at 341-42 (emphasis added). In stark contrast, § 1252(a)(2)(B)(ii) does, in fact, use the word "discretion," precluding review of "any other decision or action . . . the authority for which is specified under this subchapter to be in the *discretion*" of the AG or DHS Secretary. 8 U.S.C. § 1252(a)(2)(B)(ii) (emphasis added).

Second, *Patel* did not overrule *Kucana v. Holder*, 558 U.S. 233 (2010). Although the *Kucana* Court did not decide the instant question, Justice Ginsburg's majority opinion characterized § 1252(a)(2)(B)(ii) as "barr[ing] court review of *discretionary decisions* only when Congress itself set out the Attorney General's discretionary authority in the statute." *Id.* at 247 (emphasis added). It added further that Congress "had in mind decisions . . . made *discretionary* by legislation," *id.* at 246-47, and stated that "other decisions falling within § 1252(a)(2)(B)(ii)'s compass are most sensibly understood to include *only decisions made discretionary by Congress*." *Id.* at 247 n.14. The Second Circuit has previously suggested a similar construction, stating that "§ 1252(a)(2)(B)(ii) strips us of jurisdiction to review *certain discretionary decisions*." *See Nethagani v. Mukasey*, 532 F.3d 150, 154 (2d Cir. 2008) (emphasis added).

Thus, even in the wake of *Patel*, the text of the statute, precedent, and context indicate that the provision cannot overcome the strong presumption in favor of reviewability.

### III.   REVIEW OF THE USCIS DETERMINATION

Finding that it has jurisdiction to review non-discretionary USCIS determinations, the Court turns to the merits.  Here, the Court's review of agency action under the APA is "necessarily narrow," *see Islander E. Pipeline Co., LLC v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008), and the Court will uphold the agency action so long as the "agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and choice made."  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

In his Complaint, Mia requests relief on several grounds.  The Court proceeds with the benefit of Judge Glasser's considered decision, s*ee Rahman v. U.S. Dep't of Homeland Sec.*, 593 F. Supp. 3d 49 (E.D.N.Y. 2022), *aff'd sub nom. Rahman v. Mayorkas*, No. 22-904-CV, 2023 WL 2397027 (2d Cir. Mar. 8, 2023), which addressed similar arguments brought by the same plaintiff's counsel seeking review of a USCIS determination regarding a Bangladeshi national who, like Mia,

16

belonged to the BNP.  The Second Circuit affirmed Judge Glasser's decision

dismissing the plaintiff's complaint.  *See id.*

### A. USCIS's Determination of Inadmissibility

First, Mia argues that USCIS erred in finding that Mia's membership in the

BNP and affiliated organizations constituted membership in a Tier III terrorist

organization, or, in the alternative, Mia did not know and reasonably should not

have known that it was such an organization.[3]  Compl. 7.  To succeed on this

claim, Mia must allege "facts that, when accepted as true, plausibly suggest that

USCIS's determination, based on this finding, was 'arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law.'"  *See Rahman v.*

*Mayorkas*, No. 22-904-CV, 2023 WL 2397027, at *2 (2d Cir. Mar. 8, 2023)

(quoting 5 U.S.C. § 706(2)(A)).

However, in *Rahman*, the Second Circuit held that a USCIS determination

that the plaintiff engaged in terrorist activity and maintained membership in the

BNP, a Tier III terrorist organization, was not in error.  *Id.*  In this case, the Court's

review of the administrative record provides the same conclusion.  In a statement

submitted with his Application for Asylum, Mia stated that he was "a popular BNP

---

[3] Although this is the first argument in the Complaint, Mia appears to either
abandon or recast it in his Opposition to Defendants' Motion to Dismiss.  The
Court nevertheless considers the argument.

leader"; later, Mia confirmed that he had been an active, lifelong member of BNP and affiliated youth and student organizations since 1997.  The USCIS cited these statements, as well as several reports from the U.S. Department of State establishing that political violence was a feature of the BNP's activities during the period of Mia's membership.  Accordingly, it concluded that Mia's recruitment activities, distribution of leaflets, organizing BNP meetings/processions, and campaigning on behalf of the BNP and affiliated organizations constituted "engaging in terrorist activity" within the meaning of the INA.  Given the evidence that the USCIS supplied and cited, the Court cannot say that its decision violated the APA.

Additionally, Mia's argument that he did not reasonably know that the BNP and affiliated organizations were Tier III terrorist organizations must fail.  Given the BNP's well-documented history of political violence, "[a] person of common intelligence would have been on fair notice that the BNP could meet the definition of a Tier III terrorist organization."  *See Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1345 (11th Cir. 2021).

## B. Collateral Estoppel

Second, Mia argues that the doctrine of collateral estoppel precludes the USCIS from relitigating the question of whether BNP was a Tier III terrorist organization because the issue was already litigated by the USCIS's 2012 grant of

asylum.  Under the principle of collateral estoppel, a judgment in a prior

proceeding "bars a party from relitigating an issue if, but only if, *inter alia*, the

issue in the prior proceeding was actually litigated and actually decided." *Rahman*

*v. Mayorkas*, No. 22-904-CV, 2023 WL 2397027, at *2 (2d Cir. Mar. 8, 2023)

(quoting *Nat'l Lab. Rels. Bd. v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999))

(cleaned up).  Mia must allege facts that plausibly suggests that the question of

"whether the BNP was a Tier III terrorist organization was actually litigated." *Id.*

Mia fails to allege these facts.[4]  Indeed, in his Complaint, he states that in

"granting Mr. Mia asylum, [the] immigration judge did not find or make mention

of any mandatory terrorist bar."  Compl. at 5.  The admission that USCIS "did not

'actively' or 'verbally contest' this issue in the asylum proceeding . . . alone

forecloses any argument that the issue was 'actually litigated' for collateral

estoppel purposes." *Islam v. Kelley*, No. 1:17-CV-22237-JLK, 2019 WL 2716318,

at *2 (S.D. Fla. June 28, 2019), *aff'd sub nom. Islam v. Sec'y, Dep't of Homeland*

*Sec.*, 997 F.3d 1333 (11th Cir. 2021) (rejecting collateral estoppel argument in case

involving the BNP).  Indeed, in his Opposition, the only evidence that Mia cites is

---

[4] The Court notes that because (a) Mia continued his membership in BNP and (b)
the BNP continued to engage in terrorist activity after Mia was granted asylum,
USCIS could not have actually litigated the issue "at the time of examination for
adjustment" when it initially granted him asylum in 2012. *See Rahman*, 2023 WL
2397027, at *2.

that he had disclosed in his application and testified before the IJ that he had

supported the BNP through non-violent political activities.  As the Second Circuit

held in *Rahman*, these facts "do not plausibly establish that the issue of whether the

BNP was a terrorist organization was actually litigated."  *Rahman v. Mayorkas*,

No. 22-904-CV, 2023 WL 2397027, at *2 (2d Cir. Mar. 8, 2023).

To be sure, while there are circumstances in which the terrorism-bar issue

has actually been litigated at asylum proceedings and collateral estoppel should

apply, this case is not one of them.[5]  *Cf. Amrollah v. Napolitano*, 710 F.3d 568,

570-71 (5th Cir. 2013) (terrorism-bar issue actually litigated where the government

cross-examined the plaintiff extensively about his support of the mujahedeen

movement during the asylum proceeding, and the IJ specifically found that the

plaintiff "did not commit any violent act" that would render him ineligible for

asylum); *Islam v. U.S. Dep't of Homeland Sec.*, 136 F. Supp. 3d 1088, 1092 (N.D.

Cal. 2015) ("the precise issue of whether Islam participated in terrorist activity

---

[5] Mia cites *Fofana v. Wolf*, 437 F. Supp. 3d 673 (D. Minn. 2020), twice to argue
that the initial asylum proceeding necessarily litigates the terrorism-bar issue, and
collateral estoppel thus applies.  What Mia neglects to add is that the Eighth Circuit
*reversed* the district court and joined other appellate courts in holding that "for an
issue to be 'actually litigated,' the issue must have been 'raised, contested, and
submitted for determination' in the prior proceeding, and it must be determined."
*See Fofana v. Mayorkas*, 4 F.4th 668, 671 (8th Cir. 2021), *cert. denied*, 142 S. Ct.
1124 (2022) (quoting *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019))
(citing *Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1341 (11th Cir.
2021)).

under 8 U.S.C. § 1182(a)(3)(B)(i)(I) was actually litigated in the asylum proceeding" because the DHS cross examined Islam during his asylum hearing about his involvement with the organizations, and the DHS and Islam each addressed whether Islam was involved in terrorist activity).

Mia argues that the IJ actually litigated the issue by implication, as the IJ was statutorily barred from granting asylum to someone inadmissible under the terrorism bar.  However, courts — including the Second Circuit — have rejected this argument, holding instead that "a grant of asylum alone is insufficient to show that a terrorism bar was actually litigated." *Rahman*, 2023 WL 2397027, at *2 (citing cases); *see also Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1341 (11th Cir. 2021) (collateral estoppel did not apply because the issue of whether the BNP is a Tier III terrorist organization—and thus whether the plaintiff is a member of, or provided material support to, such an organization—was not actually litigated in the asylum proceeding); *Janjua v. Neufeld*, 933 F.3d 1061, 1063 (9th Cir. 2019) (issue of whether the organization qualified as a terrorist organization was never raised or discussed at asylum hearing, and therefore issue not actually litigated).

In his Opposition, Mia recasts the collateral estoppel argument, contending that the grant of asylum and the later denial of adjustment of status fundamentally contradict, and it was thus "arbitrary and capricious" for the agency to "completely

change[] its position" on Mia's admissibility under the terrorism bar.  However, as elaborated above, the agency did not change its position because, as the USCIS explained in considering Mia's rebuttal, "a review of your case does not indicate the Immigration Judge made such a determination" on the BNP's status as a Tier III terrorist organization in 2012.  CAR 14.  Additionally, federal appellate courts have repeatedly permitted USCIS to find people inadmissible under the terrorism bar as part of the adjustment-of-status inquiry, even though an IJ had previously granted them asylum.  *See, e.g.*, *Rahman*, 2023 WL 2397027, at *2; *Islam*, 997 F.3d at 1342; *Janjua*, 933 F.3d at 1067–68.

## C. Due Process

Finally, Mia argues in his Complaint that he was denied due process on the grounds that Defendants' "refusal to provide for a further review of the denied application violates Due Process" and "Defendants' failure to give Plaintiff a meaningful opportunity to challenge the basis of the denial of the I-485 application violated his substantive Due Process rights."  Compl. 7.

The Court must dismiss this claim.  First, Mia appears to have abandoned the claim, failing to address the Defendants' arguments for dismissal in his submissions.  Second, Mia's Complaint "contains no factual allegations by which the Court may assess the plausibility of Plaintiffs' bare legal conclusions" and has thus failed to state a claim.  *See Rahman*, 593 F. Supp. 3d at 57.  Indeed, there is no

indication of how, specifically, Defendants deprived him of his due process rights. Third, a review of the record indicates that Defendants supplied ample due process. In fact, the USCIS specifically informed Mia that he could submit a rebuttal to its intent to deny his Form I-485, and Mia availed himself of that opportunity, with the benefit of representation by counsel.  Accordingly, this due process claim is dismissed.[6]

Regrettably for Mia and many others in his position, because the statutory bar applies to people who "engaged in a terrorist activity" — no matter how long ago or if the person ceased participation therein — USCIS lawfully determined that Mia is ineligible for adjustment of status, despite its previous grant of asylum. *See Rahman*, 2023 WL 2397027, at *1 (affirming district court's dismissal of plaintiff's complaint in similar factual circumstances).  While the Court finds Mia's in-limbo status unfortunate, it emphasizes, per the USCIS, that Mia will not lose his asylum status and will remain authorized to work, so long as USCIS or the Executive Office for Immigration Review does not formally terminate his asylum status.

---

[6] Any claim for attorney's fees must fail because Mia must first prevail on a substantive claim.  *See Rahman v. U.S. Dep't of Homeland Sec.*, 593 F. Supp. 3d 49, 58 (E.D.N.Y. 2022) (citing 5 U.S.C. § 504(a)(1); 28 U.S.C. § 2412(b)).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

**SO ORDERED.**

                                          _/S/ Frederic Block_____
                                          FREDERIC BLOCK
                                          Senior United States District Judge

Brooklyn, New York
October 26, 2023